UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CARL HILL,                          }
                                    }
          Plaintiff,                }
                                    }
v.                                  }          CV 00-AR-3400-S
                                    }
JIM WALTER RESOURCES, INC.          }          **ENTERED**
                                    }
          Defendant.                }          JUL 0 8 2002

## MEMORANDUM OPINION

Before the court is a motion for summary judgment filed by defendant, Jim Walter

Resources, Inc. ("Jim Walter").

Plaintiff, Carl Hill ("Hill"), instituted this action against Jim Walter on November 27,

2000. He asserts claims of race discrimination and retaliation under Title VII of the Civil Rights

Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.,* and 42 U.S.C. § 1981. More

specifically, Hill alleges that he was subjected to a hostile work environment; that he was

subjected to disparate treatment in discipline, drug testing, and scheduling of leave; and that he

was retaliated against for his complaints of discriminatory conduct.

### I. STATEMENT OF MATERIAL FACTS

Hill, an African-American, is employed by Jim Walter as an Inside Laborer at Jim

Walter's Brookwood location, Mine Number Four ("Mine #4"). Hill began his employment with

Jim Walter in December 1980. Hill is a member of the United Mine Workers of America

("UMWA") and is therefore subject to the terms and conditions of the collective bargaining

agreement ("CBA") between Jim Walter and the UMWA.

In 1998, Hill and three other Jim Walter employees filed suit in this court against Jim



Walter, alleging that they were discriminated against on the basis of race and were subjected to a racially hostile work environment. *See Foster v. Jim Walter Resources, Inc.*, CV-98-AR-549-S.[1] The 1998 lawsuit was settled.[2]  As part of the settlement, Hill agreed that if he again experienced a racially hostile environment, he would "'file a grievance and/or report the conduct to the Industrial Relations Supervisor[3] and/or the Mine Manager, within a reasonable time period to allow [Jim Walter] to fully investigate the allegations.'" (Jim Walter's Br. Supp. Mot. Summ. J. at 3 (internal citations omitted).)

Hill alleges that Jim Walter also agreed to undertake certain obligations as part of the settlement agreement, and he avers that these portions of the agreement were "a major inducement to the plaintiffs to settle the case." (Pl.'s Opp'n Mot. Summ. J. at 2.)  According to Hill, Jim Walter agreed that "in the future it would vigorously enforce its racial harassment policy and would provide extensive training to all of its employees in regards to the racial harassment policy.  Management assured the plaintiff that it would not tolerate any form of racial

---

[1]In the 1998 action, the plaintiffs asserted claims under Title VII and §1981, and they alleged that they had been discriminated against with respect to work assignments, compensation, and promotion and that they had been subjected to a hostile work environment.  More specifically, the plaintiffs complained that they were the targets of racial slurs, that Jim Walter allowed racial cartoons and drawings to be placed on bulletin boards and otherwise publicly displayed, that they were given the hardest, less desirable jobs and work assignments, and that Jim Walter failed to promote them.

[2]After a successful mediation by the parties, this court, on April 28, 1999, entered an order dismissing the action with prejudice.

[3]Each of Jim Walter's mining sites is staffed by an Industrial Relations Supervisor, who is responsible for "all aspects of personnel and human resources." (Jim Walter's Br. Supp. Mot. Summ. J. at 2.)  This Supervisor is also responsible for "posting and administering company policies, including the anti-harassment policy." (Id.)  The Industrial Relations Supervisor reports directly to the Mine Manger, who is the highest ranking Jim Walter official based at each mine site.

2

harassment." (Id. at 2.)

Pursuant to the settlement agreement, Jim Walter trained its Mine #4 employees regarding its anti-discrimination and anti-harassment policy[4] in June 1999. Jim Walter conducted an hour-long meeting with Mine #4's hourly employees[5] to discuss the company's policies regarding discrimination and harassment. During this meeting, the employees were told that Jim Walter "would not tolerate racial remarks or slurs or ethnic type jokes. Anything that could be offensive to an employees [sic] would not be tolerated." (Kelley Dep. at 14-15.) The Industrial Relations Supervisor explained that the employees were also told in this meeting that "we wouldn't condone any violations of the policies, [and] that people would be constructively disciplined if there [were] violations." (Id. at 14.) Jim Walter asserts that it periodically discussed this policy in its quarterly supervisory safety meetings. The Industrial Relations Supervisor also testified that the harassment policy was distributed to employees along with their paychecks and that the policy was posted at Mine #4.

In the instant litigation, Hill alleges that, "[s]ince settling the [1998] lawsuit, the environment at #4 mine has not improved." (Compl. ¶ 8.) Hill asserts that he complained to management of incidents that he believed "were racially motivated." (Id.) Hill further avers that the environment did not improve and continues to be extremely hostile, evan after he complained

---

[4]Jim Walter's policy provides in relevant part that a complaint of harassment can be made either in a written or oral fashion, and that complaints should be directed to the Industrial Relations Supervisor or the Mine Manager.

[5]Jim Walter employs both hourly and salaried employees. The foremen and supervisors are generally considered salaried employees, while all other employees are hourly. Hill, as an Inside Laborer, is an hourly employee and is subject to the CBA. The salaried employees are not covered by the CBA.

to management.  Explaining how his work environment is racially hostile, Hill claims that John

Whitsett ("Whitsett") and Ronnie Thomas ("Thomas"), two white co-workers, and Ronnie Mays

("Mays"), a white foreman/supervisor, engaged in harassing conduct.

Prior to May 17, 1999, Whitsett commented on two occasions, in response to Hill's

conversation about repairing the hardwood floors in his house, that Whitsett had a confederate

rug that Hill could place on his floors.  Thomas, on an occasion prior to May 17, 1999, indicated

to Hill that he planned to open a restaurant if Jim Walter closed Mine #4; Thomas told Hill that

he would serve fried chicken at his restaurant and that Hill would be his first customer.  Hill

treated the comment as a racial joke based upon Thomas's belief that "all black people eat fried

chicken," but Hill maintains that he did not find Thomas's comment to be funny and that he "was

highly offended by said comment."  (Def.'s Br. Supp. Mot. Summ. J. at 4-5; Pl.'s Opp'n Mot.

Summ. J. at 2, n.1.)  Hill claims that he "asked Thomas if he thought all blacks ate chicken and

Thomas 'just laughed it off.'" (Pl.'s Opp'n Mot. Summ. J. at 5.)  The conversation about the

restaurant was followed by a statement that blacks eat watermelon, but the parties disagree as to

whether Hill or Thomas made this statement.

According to Hill's deposition testimony, there are three incidents involving Mays that

occurred before May 17, 1999, and that Hill perceives as contributing to the hostile work

environment he allegedly experienced.  On one occasion, Mays instructed Hill and Judy George

("George"), a white female, to stop their rock dusting work at the telephone line because Mays

was on the telephone; the usual task assigned to George and Hill was to "rock dust the section

from the face to the end of the track at quitting time."  (Hill Dep. at 24.)  The next day, Mays

gave sent Cora Dorsey, a black female, to join Hill in rock dusting.  Because Mays was again on

4

the telephone, Hill and Dorsey "dusted to the telephone line at quitting time to stop like [George] and I did the first day, and then we went and got on the man bus to go out, [Mays] came and got myself and Cora Dorsey to get back up there and rerock dust the same area." (Hill Dep. at 25.) Minutes later, Mays sent Doug Stephenson, a white male, to assist Day and Hill. Hill felt these occurrences constituted racial harassment because Mays instructed Hill and Day to finish the task, but Mays failed to do so on the previous day when Hill was working with George, a white female.

On a different occasion, Mays told Hill "to take the man bus out" "to the bottom" and bring the bus back after George allegedly refused to complete this task and after she suggested that Hill take care of the matter. Hill had performed this task in the past, and the only others who had performed the job were Judy George and Doug Stephenson. Turning to a separate incident, Hill complained that, one morning while the employees were taking a break from work and were located in the kitchen, Mays instructed Hill to unload supplies. To explain why Mays selected Hill to perform this task, Hill claims that he was the only black employee in the kitchen. Jim Walter argues, however, that Hill was asked to unload the supplies because he was the only Inside Laborer present.

Hill testified in his deposition that he tried on three occasions to report the Whitsett, Thomas, and Mays incidents to Keith Shalvey (Shalvey"), Hill's supervisor and the Assistant Mine Manager. The first time, Shalvey told Hill to talk with him at the end of the day. Hill attempted to see Shalvey by stopping by his office three times, but Shalvey was not in his office on each of these occasions. Approximately one week later, Hill "saw Shalvey in passing and, allegedly, Shalvey stated that he had 'been pretty busy, so I haven't really had a whole lot time.'"

5

(Def.'s Br. Supp. Mot. Summ. J. at 5.)  Hill complained, one month later, to James Blankenship

("Blankenship"), president of the local UMWA chapter.  On May 17, 1999, Blankenship reported

Hill's complaints to Shalvey.  Later that same day, Jim Walter held a meeting with Hill,

Blankenship, Shalvey, Rayford Kelley ("Kelley"), the Industrial Relations Supervisor, and Trent

Thrasher, Shalvey's immediate supervisor.  After Hill explained the aforementioned incidents,

Kelley informed Hill that his allegations would be investigated.

As part of this investigation, Kelley met with Whitsett, Thomas, and Mays, and he also

met with Kenneth Boyd, a foreman/supervisor who, according to Hill, overheard Whitsett's

comments.  Whitsett, Thomas, and Mays admitted their involvement in the incidents.  These

employees were issued verbal warnings.  According to Jim Walter, "Kelley reminded Boyd of his

obligations as a supervisor to prevent and correct harassment and verbally warned him.  Also,

Kelley verbally warned Whitsett and Thomas for their behavior, reminded them of [Jim

Walter's] anti-harassment policy and informed them that they would be subject to further

discipline if they did not cease their conduct."  (Def.'s Br. Supp. Mot. Summ. J. at 6.)  Hill

disputes that Kelley ever informed these alleged offenders that they would be subject to further

discipline if they participated in similar future conduct.

Hill claims that the hostile environment persisted after the meeting on May 17, 1999, but

Hill did not thereafter have problems with Whitsett, Thomas, or Mays.[6]  The day after the May

17th meeting, Hill saw a confederate flag hoisted on a flag pole and located on the public road

leading to the mine site.  The flag was located approximately five miles from Mine #4.  Hill

---

[6]Hill argues that he did not continue to experience problems with these offending
employees because he was moved out of their area.

claims that, upon arriving at work on that same day, he noticed that a confederate flag had been drawn on a board above the time clock. Both the flag and the drawing of the flag were removed by the time that Hill completed his shift.[7] Hill did not complain to Jim Walter about these incidents, and he did not file a grievance. Hill maintains that he viewed these incidents as "additional evidence to the plaintiff, that despite the fact that the company was suppose to take steps to prevent any acts of racial hostility, the white employees of the defendant had not gotten the message." (Pl.'s Opp'n Mot. Summ. J. at 3.) Hill further argues that Jim Walter failed to conduct an investigation regarding the confederate flag incidents and thus failed to discover "who was responsible for defacing the company property." (Id. at 4.) Hill also complains of Jim Walter's failure to hold "meetings with all of its hourly employees informing them that it would not tolerate such behavior." (Id.) Kelley testified that there was not a way to investigate the flag drawings and to determine who was responsible for them, but, with regard to the hanging of the confederate flag, Kelley spoke with Whitsett about whether he was involved. (Kelley Dep. at 23, 26.)

Hill claims that, in January 2000, he found a noose in one of the mine's underground sections. Hill did not report this incident to Jim Walter, and he did not file a grievance. Jim Walter contends that it first learned of the noose incident during Hill's deposition on February

---

[7]According to Jim Walter, one day while driving to work, Kelley noticed the Mine Manager motioning for Kelley to stop. Upon stopping, Kelley noticed the flag. After he received the appropriate tools, Kelley removed the confederate flag, took it home, and burned it. Once Kelley arrived at work that day, he received a call about the flag that was drawn near the time clocks and about a flag having been drawn on a trash can. At Kelley's direction, the flags were covered with paint. Kelley subsequently asked Whitsett whether he was involved with any of these incidents. Whitsett denied any involvement. Thereafter, "Kelley informed Whitsett that he would be discharged if Kelley 'could prove [Whitsett] did it . . . or if anything like this happens again.'" (Def.'s Br. Supp. Mot. Summ. J. at 8 (alteration in original).)

7

11, 2002. In his deposition, Hill explained that he did not report the finding of the noose because Harris, an African-American supervisor, was present when Hill found the noose and because he did not know if Jim Walter would take remedial action if he did complain.[8] Hill also argues that he did not report the noose incident to management because Harris was a "management employee charged with enforcing the harassment policy." (Pl.'s Opp'n Mot. Summ. J. at 4.) According to Kelley's testimony, Harris has no knowledge of these incidents.

In his brief in opposition to Jim Walter's motion for summary judgment, Hill also points to additional evidence of what he perceives to constitute a hostile work environment.[9] He claims

---

[8]Hill was not unfamiliar with the grievance process or with the types of remedial actions that could be taken by Jim Walter as a result of filing a grievance. Hill contends that he filed several written grievances against Jim Walter. The court can detect that Hill has filed five grievances between the conclusion of the 1998 litigation and the institution of the instant suit. The first was the grievance he filed in response to the Whitsett, Thomas, and Mays incidents. This grievance resulted in an investigation and verbal warnings being issued to all offenders. Hill filed a January 2001 grievance, but the court cannot ascertain Hill's complaint therein; the grievance form indicates that the matter was settled. He also filed a June 2001 grievance, purportedly in response to receiving a final written warning in May 2001 for his absenteeism. In this grievance, Hill was protesting how management was punishing him by not allowing him to see his psychiatrist at the scheduled appointments, and he complained that he was not being treated the same as others. This grievance was denied, and management explained that Hill has a chronic and excessive pattern of absenteeism. The grievance was "referred to Step #3," but the union subsequently withdrew the grievance. The court surmises that the fourth grievance was filed as a protest to the termination of Hill's employment, and this grievance resulted in Hill being reinstated after arbitration. Hill also filed a grievance in response to the heated exchange between himself and Nathan Morgan. (*See supra* n.9.) Hill withdrew the grievance after Jim Walter agreed to counsel Morgan.

[9]In describing the hostile work environment that existed at Jim Walter, Hill points to an exchange he had with Nathan Morgan ("Morgan"), a white supervisor. Hill claims that Morgan yelled and screamed at him, said "damn" twice, but did not use racial slurs. In response to this incident, Hill field a grievance against Morgan under the CBA. Hill ceased prosecuting his grievance when Jim Walter agreed to counsel Morgan about his behavior. After Hill filed this grievance and after it was processed, Hill experienced no further problems with Morgan. Hill states that he "is not pursuing any claim based on the conduct of Nathan Morgan." (Pl.'s Opp'n Mot. Summ. J. at 10, n.5.) Therefore, the court treats any such claim as abandoned.

that he was informed, after he filed his EEOC charge of discrimination on February 3, 2000, that a white supervisor "had used the 'N' word while speaking" with another African-American employee. (Pl.'s Opp'n Mot. Summ. J. at 5.) Kelley, the Industrial Relations Supervisor, testified that the white supervisor "did not call the African-American employee a 'N' but instead while inspecting some work that had been performed by another black employee referred to the work as 'N' work." (Id. at 5.)  The supervisor who used this term received a final written warning.

Hill also alleges that he "has been discriminated and retaliated against in discipline and drug testing." (Compl. ¶ 11).  Hill's claim of discrimination with respect to the administration of discipline relates to the warnings issued to Hill purportedly due to the number and pattern of his absences from work.  Kelley contends that he issued a verbal warning to Hill in 1999 because of what Kelley detected as a pattern of absences.  Kelley asserts that Hill, beginning in 1999, developed a pattern of missing days around weekends and holidays.  Kelley also noticed that Hill used the days of leave granted to him under the CBA early in the year, and then used unexcused absences and medical excuses later in the year.  On January 7, 2000, and upon Kelley's conclusion that the pattern of absenteeism was continuing, Kelley issued a written warning for excessive absenteeism.  This warning notified Hill that further discipline would result if he did not "work regular."  Hill contends that the January 7th written reprimand was issued without prior warning: "[p]rior to issuing the plaintiff the written reprimand, Kelley had not said one word to the plaintiff concerning his attendance." (Pl.'s Opp'n Mot. Summ. J. at 4.)

Jim Walter contends that Hill's pattern of absences persisted, and that his pattern was consistent during 1999, 2000, and 2001.  During these three years, Hill used all of his graduated,

9

sick, and floating days,[10] and Jim Walter contends that these days were used early in the year.
Furthermore, during these three years, the court concludes from Hill's attendance record that
there appears to be only one month, April 2000, when Hill worked the entire month without
missing a day of work. Claiming that Hill failed to improve his attendance record after he
received the warnings, Kelley issued, on May 31, 2001, a final written warning.[11] It stated:
"Absenteeism -- Chronic excessive with a pattern around weekends, holidays, and vac[ation]. . .
Employee must work regular or further discipline will follow." (Evidentiary Submission Supp.
Def's Mot. Summ. J. at Tab 1, Hill Dep. at Def. Ex. 9.)

Jim Walter contends that this discipline was warranted under the CBA. Relying upon the
contractual rights granted to Jim Walter in the CBA regarding the right to expect "regular work"
from all employees, Jim Walter's Work Rules provide that employees violating its rules are
subject to disciplinary action, including discharge. Rule 19, entitled, "unsatisfactory attendance
record," specifically states that an "employee is expected to report to work regularly and on time
for the full normal hours of work as scheduled." (Evidentiary Submission Supp. Def.'s Mot.
Summ. J. at Tab 2, Kelley Dep. at Pl. Ex. 5.) The written warnings also indicted that Hill had
violated Article XXII of the CBA.[12] The section of the article dealing with Jim Walter's

---

[10]Under the CBA, Hill had, at that time, 13 graduated vacation days, 4 floating vacation days, 5 sick days, and 14 regular vacation days each year.

[11]Kelly testified that Jim Walter issued final written warnings for chronic and/or excessive absenteeism (or other absence-related violations of Article XXII) to other employees, including: Howard Barkley, Ronnie Thomas, Don Sloan, and John Linley.

[12]This section of the CBA created the designation of an irregular worker, and it provided that irregular workers are subject to progressive steps of discipline. Hill claims that "[i]t is undisputed that the plaintiff's attendance never caused the plaintiff to be designated an 'irregular worker.'" (Pl.'s Br. Opp'n Mot. Summ. J. at 6.)

attendance control program provides in part that "[r]egular work attendance shall be required for all Employees and all absences must be accounted for . . . An employee who makes a habit of laying off for single days other than for good cause or proven sickness and continues to do so after having been warned by Management with notice to the Mine Committee may be suspended with intent to discharge." (Pl.'s Submission Evidentiary Materials Opp'n Def.'s Mot. Summ. J. at Tab 11.)

In addition to asserting discriminatory and retaliatory discipline claims regarding Hill's attendance, Hill asserts claims for discrimination and retaliation with respect to Jim Walter's ordering of Hill to submit to a drug test.  According to Jim Walter, Hill was required to submit to drug testing under Article XXII of the CBA because Hill was placed under the attendance control program when he was issued a warning regarding his chronic and excessive absenteeism.  Hill states in his declaration that, after he filed his EEOC charge of discrimination on February 3, 2000, "Kelley forced me to submit to a drug screen despite the fact that I had never exhibited any symptoms to indicate that I was on drugs.  This was the first drug test I had been asked to submit to in over twenty years of employment.  I believe this was another act of discrimination [and] retaliation by the defendant in an effort to terminate my employment."  (Kelley Decl. at 5.)

Hill also asserts a claim for retaliation relating to Jim Walter's denial of additional bereavement leave.  Following the death of Hill's sister on May 15, 2000, Hill requested additional bereavement leave.[13]  Hill's request for additional leave was denied by both Keith

---

[13]According to the CBA, "[w]hen death occurs in an Employee's immediate family . . . an Employee, upon request will be excused for up to three (3) days, two (2) to be consecutive and include the day of the funeral and the third at the Employee's option.  The Employee shall receive pay at his regular or applicable overtime or premium rate, provided it is established that he attended the funeral.  (Evidentiary Submission Supp. Def.'s Mot. Summ. J. at Tab 1, Hill Dep.

11

Shalvey, Assistant Mine Manager, and Fred Kozell, Mine Manager.[14] Jim Walter contends that it denied Hill's request for additional bereavement leave because Hill had "received all bereavement due to him under the union contract." (Answer, Eighteenth Defense, ¶ 9.) Jim Walter further contends that, at the time Hill requested additional bereavement leave, he had seven vacation days which could have been used.

After being denied additional bereavement leave, Hill obtained a doctor's excuse that indicated he was not able to work from May 15th through May 29th. Thus, Hill's absences from the 15th through the 19th and the 22nd through the 26th were noted as non-contractual absences for being sick and having a doctor's excuse. Because of Hill's alleged sickness during these periods, Hill as eligible for and he received "sick benefits" for this two-week period. Hill returned to work on May 30th and was informed that he could have an optional day of bereavement leave. Hill took that optional bereavement leave on June 2nd. The evidence indicates that Hill received at lest one day of pay for bereavement leave, but the record does not adequately inform the court for which day this pay was received.

Hill maintains that his failure to receive three days of pay constituted discrimination and retaliation. He asserts that Jim Walter allowed white employees to take additional time off for bereavement leave: Janet McGiboney, David Millwood, Terrell "Catfish" Stagner, Hattie Lewis, Ethel McGhee, Charlie Whitehead, and Wilbur Whitfield. In rebuttal, Kelley asserts that the attendance records indicate that Ethel McGhee, a black female, was the only employee who was

---

at Def. Ex. 7.) Jim Walter contends that the union employees can obtain additional time off for bereavement, but they must use other days made available to them under the CBA, such as floating, graduated, sick, or vacation days.

[14]Both Shalvey and Kozell are white.

granted additional leave.  Furthermore, according to Kelley, McGhee's request for additional leave was granted in October 1998, which was "before we clamped down on attendance. Moreover, we granted Ethel McGhee's request because she had excellent attendance." (Kelley Decl. at ¶ 13.)  At the time McGhee's request was granted, she was not subject to the attendance control program, like Hill was at the time of his request.  Jim Walter argues that Janet McGiboney is a salaried employee and thus does not fall under the scope of the CBA; furthermore, according to Kelley, the attendance records for McGiboney do not reveal any time off for bereavement.  Jim Walter claims that the Millwood, Stagner, Lewis, Whitehead, and Whitfield were able to extend their bereavement leave by using doctors' excuses or additional contractual leave.  Kelley stated in his declaration that "[o]n some occasions, [Jim Walter] has excused some employees because of a death where employees had no contractual days left. However, this practice is rare and is only granted to employees with good attendance records." (Kelley Decl. at ¶ 10.)

Jim Walter terminated Hill's employment in February 2002;[15] Kelley cited chronic absenteeism as the reason for Hill's discharge.  Hill filed a grievance against Kelly, and the arbitrator found that Hill had not been excessively absent at the time of his discharge and ordered reinstatement of Hill with back pay.

## II. DISCUSSION

Under Title VII and § 1981, it is unlawful for employers to require their employees to work in a discriminatorily hostile or abusive environment.  Title VII and § 1981 also prohibit

---

[15]Hill states in his brief in opposition to Jim Walter's motion for summary judgment that he "does not have a termination claim in this lawsuit because of the date of his termination." (Pl.'s Opp'n Mot. Summ. J. at 6, n.4).

employers from discriminating against their employees on the basis of race and from retaliating against employees because those employees have made charges of discrimination or have participated in proceedings addressing other employment practices made unlawful under these statutes.  In making these practices unlawful, both Title VII and § 1981 "have the same requirements of proof and use the same analytical framework;" thus, courts have typically addressed the Title VII claim with the understanding that "the analysis applies to the § 1981 claim as well."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11ᵗʰ Cir. 1998).  *See also Cartwright, v. Tacala, Inc.*, No. 99-W-663-N, 2000 U.S. Dist. LEXIS 20500, at *15-16 (M.D. Ala. 2000) (in analyzing plaintiff's claims brought under to Title VII and § 1981, the prima facie cases for establishing a hostile work environment were identical); *Fletcher v. ADT Security Services, Inc.*, No. 1:99-CV-0504-CC, 2000 WL 33231616, at *11 (N.D. Ga. Sept. 7, 2000) (in analyzing plaintiff's claim of retaliation under Title VII and § 1981, the court used the same framework).  Consequently, the following discussions of Hill's hostile work environment, disparate treatment, and retaliation claims apply equally to the Title VII and the § 1981 claims.

      A.    Hostile Work Environment

To demonstrate the existence of a racially hostile work environment, a plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment "must have been based on a protected characteristic of the employee," such as race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer either directly or vicariously liable.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11ᵗʰ Cir. 2002).  At the heart of this controversy is the

14

issue of whether there is a basis for holding Jim Walter liable for any alleged hostile work environment that existed at Mine #4.

As indicated above, employers can be held accountable for conduct creating a hostile work environment on two distinct bases: direct liability or vicarious liability. Employers are held directly and strictly liable for a hostile environment when the harasser is a supervisor with immediate (or successively higher) authority over the employee and when the supervisor takes tangible employment action against the plaintiff victim. Direct liability can also result where the harasser is "a co-employee of the plaintiff victim" and where the employer "knew or should have known of the harassing conduct but failed to take prompt remedial action. Thus, a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer." *Miller*, 277 F.3d at 1278 (citing *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000)).

The employer is subject to vicarious liability when the harasser is a supervisor with immediate (or successively higher) authority over the employee, but when no tangible employment action has been taken. But the employer, facing the threat of vicarious liability, may raise the *Faragher/Ellerth* affirmative defense.[16]

---

[16]Elaborating on the breadth of this affirmative defense, the *Faragher* court stated:
> While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by

15

> The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher v. City of Boca Raton*, 118 S. Ct. 2275, 2292-93 (1998).

Rather than turning to the issue of whether a prima facie case of racial harassment has been established in this case,[17] the court will now divert its attention to the defenses that are now asserted by Jim Walter and that would negate Hill's satisfaction of the first four elements of a prima facie case. Because the facts indicate that the hostile work environment was created by both co-workers and supervisors, the court must consider the issues of direct liability for the co-

---

> the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher*, 118 S. Ct. at 2292-93.

[17]If the court were to focus its discussion on the issue of whether the racially discriminatory environment at Jim Walter's Mine #4 is sufficiently severe and pervasive to constitute an actionable hostile work environment claim, the court would be faced with an interesting question because of the recent decision of the Supreme Court of the United States in *National Railroad Passenger Corp. v. Morgan*, No. 00-1614, 2002 WL 1270268 (June 10, 2002). In that opinion, the court concluded that incidents occurring prior to the 180- or 300-day limitations periods could form a basis for liability and damages. Specifically, the court held that a "charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [180- or 300-day] time period." The court also stated that "the incidents comprising a hostile work environment are part of one unlawful employment practice."

Turning to the case at bar, if the hostile work environment complained of by Hill is indeed one continuous unlawful employment practice, the court should consider the facts constituting the hostile work environment at issue in the 1998 litigation, namely, the racial cartoons. Ordinarily, the doctrines of res judicata and/or collateral estoppel would operate to preclude the court from considering the facts pertinent to the 1998 litigation (and would therefore limit the evidence relevant to the instant hostile work environment claim to those incidents occurring after settlement of the 1998 suit). Does *Morgan* override these fundamental principles of law?

16

worker harassment and vicarious liability for the harassment by supervisors that did not culminate in a tangible, adverse employment action.

           1.      Co-Worker Harassment & Direct Liability

In Hill's hostile work environment claim, he claims that Whitsett and Thomas made racial comments to him regarding stereotypical types of food eaten by African-Americans and regarding confederate flags. He also claims that the flying of a confederate flag on a pole near the mine site, the drawing of a confederate flag, and the presence of a noose underground constitute racial harassment by his co-workers. To demonstrate a basis to hold Jim Walter directly liable for the harassment of Hill by co-workers, Hill must demonstrate that a genuine issue of material fact exists on the questions of whether Jim Walter had actual or constructive notice of the harassment and whether Jim Walter failed to take remedial action. The court finds that Hill cannot meet this burden.

"Actual notice is established by proof that management knew of the harassment, whereas constructive notice will be found where the harassment was so severe and pervasive that management should have known of it." *Miller*, 277 F.3d at 1278. Because Hill filed a grievance with his union president and because the president informed Shalvey, the Assistant Mine Manager, of the grievance, Jim Walter had notice of the comments made by Whitsett and Thomas. Additionally, on the very day that Jim Walter learned of the harassing behavior, Jim Walter held a meeting with Hill. Thereafter, Kelley, the Industrial Relations Supervisor, investigated the matters, met with each of the alleged offenders, and obtained admissions of guilt from Thomas and Whitsett. Kelley reminded Whitsett and Thomas of Jim Walter's policy against harassment, and he issued verbal warnings to them. Kelley also met with the supervisor

17

who allegedly witnessed one of these comments, and Kelley reminded him of his obligations to report such harassing conduct. Thus, because Jim Walter acted swiftly in meeting with Hill and investigating the incidents, because Jim Walter imposed what it perceived to be an appropriate form of discipline, and because Jim Walter adhered to its anti-harassment policy, the court cannot find that Jim Walter failed to take proper remedial action.

Given that Kelley and the mine manager of Mine #4 saw the confederate flag that was flying from a flag pole near Mine #4 and given that Kelley testified to having been informed of the confederate flags drawn near the time clock and on a trash can, the court is hard-pressed to find anything but that Jim Walter had actual knowledge of these incidents. Nonetheless, the precedent by which this court is bound would dictate a finding that Jim Walter did not have actual notice of these occurrences because Hill did not file a grievance or otherwise report these incidents to the Industrial Relations Supervisor or Mine Manager, as is required under the anti-harassment policy. This line of inquiry is not necessarily important, however, because the court also concludes that, if Jim Walter had any kind of notice of the flags, then Jim Walter took prompt remedial action. After Kelley saw the flag on the flag pole, he removed it, took it home, and destroyed it. Once Kelley was notified of the flag drawings, he instructed an employee to paint over them. Thus, by the end of Hill's shift on the day that he noticed the flag and the flag drawings, there were no confederate flags and no confederate flag drawings located in and around Mine #4. Consequently, with respect to the confederate flag incidents, Hill cannot demonstrate the existence of a genuine issue of material fact which would warrant a trial on the merits, addressing the question of whether Jim Walter has satisfied both prongs of the affirmative defense.

18

When considering the noose incident, the court's inquiry must proceed beyond the question of actual notice. Neither Hill, nor any other employee, ever reported to Jim Walter the incident in which Hill allegedly found a noose while working underground. If it is true, as Hill contends, that Harris witnessed this incident, Harris did not inform the Industrial Relations Supervisor or the Mine Manager. Thus, the court cannot find that Jim Walter had actual notice of this incident. The court is equally hard-pressed to find that Jim Walter had constructive notice of the noose. When considering the issue of constructive notice of harassment, the Eleventh Circuit holds the following factors to be relevant:

> "(1) the remoteness of the location of the harassment as compared to the location of management; (2) whether the harassment occurs intermittently over a long period of time; (3) whether the victims were employed on a part-time or full-time basis; and (4) whether there were only a few, discrete instances of harassment."

*Miller*, 27 F.3d at 1278-79 (quoting *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997)). Additionally, courts consider whether the employer maintained an anti-harassment policy: "when an employer has 'promulgated an effective and comprehensive' anti-harassment policy that is 'aggressively and thoroughly disseminated' to its employees, an employee's failure to utilize the policy's grievance process will prevent constructive knowledge of such harassment from adhering to the employer." *Miller*, 277 F.3d at 1279 (quoting *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997) (alteration in original)). Thus, because Jim Walter has an anti-harassment policy that was published to the employees and posted at the mine site, because the policy clearly states that complaints of harassment are to be directed to the Industrial Relations Supervisor or the Mine Manager, and because Hill did not follow those procedures outlined in the policy, the court finds that Jim Walter cannot be imputed with

19

constructive notice of the noose incident.  Furthermore, the noose incident was isolated, and it occurred only on one occasion.  Even examining the noose in combination with the other alleged instances of harassment, the court finds that the harassing conduct was not sufficiently severe or pervasive as to constitute constructive knowledge to Jim Walter because the allegedly harassing incidents appear to be infrequent, disconnected, and occurring over a relatively short period of time.

Because the court cannot find that Jim Walter did not have actual or constructive notice of the allegedly harassing incidents, the court finds that Jim Walter can successfully avail itself of the affirmative defense.  Therefore, there is no basis for holding Jim Walter liable for the incidents of co-worker harassment.  Accordingly, Jim Walter is entitled to summary judgment on Hill's hostile work environment claim insofar as he asserts that co-workers created that environment.

2.      Supervisor Harassment & Vicarious Liability[18]

According to Hill, Mays harassed Hill when Mays instructed Hill and a black co-worker to finish rock dusting though Mays had allowed Hill and a white co-worker to stop rock dusting at an earlier point on the track the day before, when Mays forced Hill to perform the tasks related to taking the man bus out after a white co-worker allegedly refused to do so, and when Mays instructed Hill to return to work from his break so he could unload supplies while three white employees remained on break.  The harassing conduct by Mays was addressed when Hill filed his grievance with the union president and when Kelley called a meeting in response to this

---

[18]The court will not consider Jim Walter's liability for any alleged harassment of Hill by Morgan, because Hill has abandoned such claims.  (See Pl.'s Opp'n Mot. Summ. J. at 10, n.5; see also n.9 *infra.*)

20

grievance. In this meeting, which was held on the same day that Kelley was made aware of Hill's grievance, Hill had an opportunity to discuss Mays's actions. And after the meeting, Kelley investigated the matters and that investigation included a meeting with Mays. Thereafter, Kelley issued a verbal warning to Mays. In taking these actions, Kelley was following the procedures outlined in Jim Walter's anti-harassment policy, a policy that was disseminated to the employees. Thus, the court finds that Jim Walter exercised reasonable care to prevent and correct promptly the harassing conduct.

Hill, however, contends that Jim Walter cannot successfully defend Hill's claims with the *Faragher/Ellerth* defense. It appears to the court that Hill's argument goes something like this: Upon filing the 1998 suit, which included a claim for hostile work environment, Jim Walter was placed on notice that it had a problem with racial harassment. Once Jim Walter settled the 1998 suit, it agreed to vigorously enforce its anti-harassment policy. Because Hill continued to experience a hostile work environment after settling the 1998 suit, Jim Walter has obviously not exercised reasonable care to prevent and correct its problems. As illustration, Hill continued to experience harassment after Jim Walter verbally warned Mays, Whitsett, and Thomas, which means that Jim Walter should have issued more severe discipline in order to uphold its end of the settlement agreement and in order to prevent and correct the harassment problems.

The court rejects this line of analysis. It is impractical in today's society to assume that workplaces can and will be free of all discrimination, intimidation, and harassment. Moreover, Title VII does not require employers to rid their workplaces of all forms of racial harassment and hostility. Instead, "Title VII requires only that the employer 'take steps reasonably likely to stop the harassment.'" *Saxton v. American Telephone & Telegraph Co.*, 10 F.3d 526, 535 (7th Cir.

21

1993).  The evidence and arguments before the court suggest that Jim Walter believed that the verbal warnings it issued were sufficient, especially because the alleged harassers were first-time offenders of the anti-harassment policy.  Furthermore, Hill has offered no proof that the policy was an ineffective deterrent, that other persons felt comfortable to pursue their harassing conduct because they knew that Jim Walter would not severely punish them, or that Jim Walter was in essence condoning the harassing conduct.  In contrast, the evidence reveals that once any knowledge of harassment was brought to Jim Walter's attention, whether through Hill or other means, Jim Walter took immediate remedial steps.  For example, when Kelley and the Mine Manager saw the confederate flag hoisted on the flag pole, both immediately removed it.  When Kelley was notified of the drawings of the confederate flag, Kelley ordered that the drawings be painted over, and this order was completed before the conclusion of that shift.  The evidence before the court reveals that the only time Jim Walter did not take immediate, remedial action was when Jim Walter did not know of the harassing conduct.

Hill knew that Jim Walter had a settlement obligation and an obligation under Title VII to take certain, reasonable measures, and Hill knew firsthand that some form of responsive action was taken by Jim Walter with each grievance that he filed.  Nonetheless, with this knowledge in mind, Hill chose not to adhere to the anti-harassment policy and his own settlement obligations, and he chose not to report the problems he experienced to his union or to Jim Walter.  Thus, Hill failed unreasonably to take advantage of the opportunities offered by Jim Walter to bring his complaints to the attention of the union, the Industrial Relations Supervisor, or the Mine Manager.

To summarize, not only has Jim Walter established that it exercised reasonable care to

22

prevent and correct the harassing conduct, but it has also established that Hill unreasonably failed

to take advantage of any preventive or corrective opportunities or to avoid harm otherwise.

Consequently, Jim Walter can avail itself of the relevant affirmative defenses to liability for the

harassing conduct of supervisors that allegedly occurred at Mine #4.  If a hostile work

environment existed at Jim Walter's Mine #4, whether it was created by co-workers or

supervisors, there is no basis for holding Jim Walters liable therefor, and summary judgment for

Jim Walter is due to be granted.

        B.     Disparate Treatment & Retaliation

Though the prima facie cases are obviously different for claims of disparate treatment and

retaliation, the *McDonnell Douglas* burden-shifting framework applies in both instances.  Thus,

rather than discus whether Hill has satisfied a prima facie case of both disparate treatment and

retaliation, the court will immediately move to the crux of the matters: did Jim Walter articulate

legitimate, non-discriminatory and non-retaliatory reasons for subjecting Hill to drug testing and

for disciplining Hill for chronic and excessive absenteeism and did Jim Walter articulate

legitimate, non-discriminatory reasons for denying Hill's request for additional bereavement

leave and for failing to pay Hill for his bereavement leave.[19]

When a plaintiff establishes a prima facie case, a presumption that the plaintiff was the

subject of intentional race discrimination arises.  *Texas Department of Community Affairs v.*

---

[19]Insofar as Hill asserts claims for retaliation stemming from Jim Walter's denial of his
request for additional bereavement leave and for Jim Walter's failure to pay Hill for bereavement
leave, summary judgment is due to be granted because Hill abandoned those claims in his brief in
opposition to the motion for summary judgment. (See Pl.'s Opp'n Mot. Summ. J. at 10, n.6.)

*Burdine*, 450 U.S. 248, 254 (1981). The burden of production[20] then shifts to the defendant to rebut this presumption of discrimination by presenting a legitimate, non-discriminatory or non-retaliatory reason for the employment action taken against the plaintiff. *Holifield v. Reno*, 115 F.3d at 1564 (citing *Burdine*, 450 U.S. at 248). The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption of discrimination raised by the prima facie case drops from the case, and the factual inquiry proceeds to a new level of specificity. *Burdine*, 450 U.S. at 254-55 (footnotes and internal citations omitted). The core query is whether the articulated reason is pretext for unlawful racial or retaliatory animus.

At this point, plaintiff is given the opportunity to rebut the defendant's articulated reason by demonstrating that it is mere pretext for discrimination. *See Holifield*, 115 F.3d at 1565. "This demonstration merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated [and retaliated] against the plaintiff." *Id.* (internal citations omitted). Thus, the focus of the case at this stage is on the employer's "subjective intent and the motivation behind the defendant's adverse employment actions directed at [the employee]." *Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1084 (11th Cir. 1996). In persuading the court that he has been the victim of intentional discrimination or retaliation, the plaintiff may succeed "either directly by persuading the court that a discriminatory [or retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Taking each allegedly adverse employment

---

[20]The burden placed upon the defendant to articulate a legitimate, non-discriminatory reason is not a burden of persuasion; it is, however, a burden that can be discharged only through admissible evidence that clearly explains the defendant's proffered reasons.

action suffered by Hill in turn, the court finds that Hill cannot carry his burden of establishing a genuine issue of whether Jim Walter's articulated reasons are pretextual.

               1.     The written warnings for chronic and excessive absenteeism

Kelley issued a written warning to Hill on January 7, 2000, for excessive absenteeism. This warning provided that Hill "must work regular or further discipline will follow." Hill was issued a final written reprimand on May 31, 2001, because, according to Kelley, Hill had a pattern of missing work around the weekends and holidays. This warning also indicated to that further discipline would be imposed if Hill did not "work regular."

From reviewing Hill's attendance records for the years 1999, 2000, and 2001, Hill took advantage of and was absent on 46-48 days of each year for various kinds of contractual leave. And in those same years, Hill missed numerous days that were not granted to him under the CBA. In fact, Hill missed an additional 30, 61, and 27 days in 1999, 2000, and 2001 respectively.[21] Assuming that Hill was scheduled to work 6 days a week, for 52 weeks of the year, and considering the number of contractual leave days taken by Hill and the number of days Hill was otherwise absent, out of a possible 312 days of work, Hill was present for 236 days in 1999, 205 days in 2000, and 237 days in 2001. Thus, at best during these three years, Hill was present for work only on 76% of the days for which he was scheduled.

Furthermore, after reviewing the calendars and attendance records for the three years in issue, it appears that there was indeed a pattern to Hill's absenteeism. He used his contractually-

---

[21]The court's figures do not and will not count the days when Hill's shift was cancelled or where management caused Hill to work an incomplete shift. The 2000 figure includes the days Hill missed when he underwent surgery on his foot, and the 2000 figures also includes the additional 20 non-contractual days of work that Hill missed.

granted graduated and floating vacation days and his contractually-granted sick/personal days in the first quarters of the years. It also appears to the court, that more frequently than not, Hill was absent from work for multiple days at a time, rather than for one day at a time; and on several occasions, Hill's absences appeared to be designed to extend holidays, weekends, and vacations.

Consequently, the court finds that Jim Walter has sufficiently articulated a legitimate, non-discriminatory and non-retaliatory reason for issuing the two reprimands to Hill. Furthermore, the arguments made by Hill do not persuade the court that these articulated reasons are mere pretext for unlawful discrimination and retaliation. Hill focuses his arguments on the fact that Jim Walter is responsible for a great number of Hill's absences. The aforementioned numbers relied upon by the court discount the days where Hill was absent because Jim Walter management, for whatever reason, told him to be absent. Hill also argues that Hill is "allowed to use his . . . guaranteed contract days whenever he . . . so desires." (Pl.'s Opp'n Mot. Summ. J. at 18.) While this argument may be factually true, this argument alone does not create pretext. Hill asserts that in 1999, 91% of his absences were either "guaranteed to him pursuant to the union contract, caused by the defendant cancelling the plaintiff's shift and/or were caused by the plaintiff being out of work and under the care of his physician. In 1999, the plaintiff had seven absences that were designated by the defendant as 'unexcused.'" (Id.)  In making this argument, Hill assumes that an absence for sickness should automatically be excused, with or without a doctor's excuse. Hill also appears to assume that employees are always entitled to miss work for sickness with impunity. The court does not operate on these assumptions, and these assumptions

26

do not add up to pretext.[22]  Additionally, Hill attempts to call into question the legitimacy of

Kelley's statement that he has issued warnings to three white employees for attendance problems,

but Hill does so without remembering that he bears the burden of persuading the court, at this

stage, that there is at least a genuine issue of whether Jim Walter was motivated by

discriminatory and retaliatory animus.  Hill has not persuaded the court that such an issue exists.

Accordingly, Jim Walter is entitled to summary judgment on the claims that Jim Walter

discriminated and retaliated against him when Jim Walter issued the two warnings for chronic

and/or excessive absenteeism.

        2.     The drug testing

     Hill complains that, when Jim Walter required Hill to submit to a drug test "sometime in

2001," Jim Walter was discriminating against Hill because of his race and that Jim Walter was

---

[22]In an attempt to bolster his claims of discrimination and retaliation regarding the imposition of discipline and the subjection to a drug test, Hill, in his deposition, seemed to argue that his absences were necessitated by doctor's appointments. After two years of continued treatment, Hill's doctor sent a letter to Kelley, informing him that Hill would be setting up regular appointments to meet with the doctor every two weeks. According to Hill, upon receiving the letter, Kelley "said he had problems with me going to the doctor." (Hill Dep. at 100.) Hill claims Kelley informed him that he needed to schedule his appointments "around a different time to go." (Id.) Hill believes that Kelley's problems with the medical appointments were a form of retaliation. Hill seems to believe that he was subjected to drug testing as a form of retaliation for the scheduling of his doctor's appointments. Hill testified as follows in his deposition:

Q:    And, again, why do you claim that Mr. Kelley issued you these two warnings, the written reprimand and the final written reprimand because of your race or for retaliating against you?

A:    Because there's other people that take off and go to the doctor on a regular basis for months at a time.  Go to doctors and nothing's done or said about it."

(Hill Dep. at 107).

    Though these arguments may explain some of Hill's absences, they do nothing to demonstrate a genuine issue of whether Jim Walter was more likely motivated by discriminatory or retaliatory animus or of whether Jim Walter's articulated reasons lack credence.

27

retaliating against him for his complaints of discrimination.  Jim Walter's substance abuse policy

provides that Jim Walter has reasonable cause to require an employee to submit to drug testing

when that employee has been placed in an attendance control program.  Because Jim Walter had

issued attendance warnings to Hill for violations of the Work Rules and Article XXII, and

because Hill had been placed under the attendance control program, Jim Walter had reasonable

cause to require Hill to submit to a drug test.  Thus, the court finds that Jim Walter's reasons for

requiring Hill to submit to a drug test are legitimate, non-discriminatory and non-retaliatory

reasons.

Hill attempts to demonstrate that the articulated reasons are in reality pretext for racial

and retaliatory animus by arguing that Hill "had never exhibited any symptoms to indicate that he

was on drugs."  He also argues that "[t]here is no evidence in the record that Kelley ever required

anyone else to submit to a drug screen that had been given a final warning on attendance and/or

was not at least exhibiting some sign that he/she might be taking drugs."  These arguments do not

create a genuine issue of material fact regarding whether Jim Walter was motivated by racial or

retaliatory animus when it required Hill to submit to a drug test.  The burden is on Hill, not Jim

Walter, to create the issue of material fact; Hill's argument that Jim Walter has not offered

evidence to support its articulated reason does not satisfy Hill's burden.

Hill also argues that Jim Walter did not have reasonable cause to order Hill to submit to

drug testing because the arbitrator held, after Hill's termination in February 2002, "that Hill's

attendance did not constitute excessive absenteeism or a violation of the defendant's attendance

control program."  (Pl.'s Opp'n Mot. Summ. J. at 21.)  The arbitrator's ruling in February 2002

has no bearing on the legitimacy and credibility of Jim Walter's reasoning in 2001 for requiring

28

Hill to submit to drug testing.  Thus, Hill has failed yet again to create a genuine issue of whether Jim Walter's articulated reasons for subjecting Hill to drug testing are pretextual.  Accordingly, insofar as Hill asserts racial discrimination and retaliation claims for Jim Walter's requirement that Hill take a drug test, summary judgment is due to be granted in Jim Walter's favor.

3.   The denial of Hill's request for additional bereavement leave

When his sister died on May 15, 2000, Hill requested leave in addition to the three days to which he was contractually entitled under the CBA.  Recognizing that Hill was entitled contractually only to three days, that Hill could have used his paid vacation leave rather than seek additional unpaid leave, and that Hill was an employee who had been disciplined for chronic and excessive absenteeism, Jim Walter denied Hill's request.  Having articulated a legitimate, non-discriminatory reason for this employment decision, the inquiry now proceeds to determine whether these articulated reasons are mere pretext for racial animus.  Though this specific discrimination claim is not discussed in his brief in opposition to summary judgment, the court surmises from Hill's deposition that he attempts to demonstrate that discriminatory animus more likely motivated Jim Walter by arguing that Jim Walter has granted additional, unpaid bereavement leave to the following employees: Janet McGiboney, a white female; David Millwood, a white male; Terrell "Catfish" Stagner, a white male; Hattie Lewis, a black female; Charlie Whitehead, a white male; and Wilbur Whitfield, a black male.  Thus, Hill appears to be arguing that similarly situated employees were treated more favorably than he was.

When a plaintiff seeks to prove racial discrimination by presenting evidence that similarly situated, non-minority employees were treated more favorably, the burden is on the plaintiff "'to show a similarity between [his] conduct and that of white employees who were treated differently

29

and not on [the defendant] to prove their similarity.'" *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (citations omitted) (alteration in original). "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (affirming and quoting as an appendix the district court's opinion that grants summary judgment in favor of defendant) (string citations omitted). As explained below, Jim Walter has failed to create a genuine issue of whether these employees are similarly situated and thus whether Jim Walter's articulated reasons for denying his request for additional bereavement leave are pretextual.

Janet McGiboney is not similarly situated to Hill because she is a salaried employee, and as such, is not covered under the CBA. Furthermore, even if she was similarly situated, Jim Walter asserts that McGiboney's records do not reveal that she took any bereavement leave at any time. Furthermore, because Hill is claiming that he was treated differently because he is black, Hill cannot use Hattie Lewis, Ethel McGhee, and Wilbur Whitfield as comparators because they are also black. Even if the court were to find that these three black employees were granted additional bereavement leave, that finding would not support Hill in his attempt to argue that race was the motivating factor in Jim Walter's denial of his request; if that finding would prove anything, it would tend to prove that race was not a motivating factor in Jim Walter's decision. Now turning to the non-salaried, white employees offered by Hill as comparators, the court cannot find that these employees were treated more favorably than Hill. Each of these employees received additional time off, but they received the additional time, not by using unpaid bereavement leave, but instead by using other leave available to them under the CBA

30

(such as vacation leave) or by obtaining a physician's excuse. Because Hill has not provided a proper comparator to establish that similarly situated, non-minority employees were treated more favorably, and because Hill has not offered any arguments in his brief to support the finding that there is a genuine issue of whether Jim Walter was more likely motivated by racial animus than by its articulated reasons, Jim Walter is entitled to summary judgment on Hill's claim that Jim Walter discriminated against him when he was denied additional, unpaid bereavement leave.

4.    The failure to pay Hill for one day of bereavement leave

When Hill's sister died and after Hill was denied additional, unpaid bereavement leave, Hill submitted to Jim Walter an excuse from a physician that indicated he could not work from May 15th until May 29th. Hill, relying upon this doctor's excuse, was absent May 15th through May 19th and May 22nd through May 26th.[23] When Hill returned to work on May 30th, he was notified that he could take the optional day of paid bereavement leave; he did so on June 2nd. According to the attendance records, June 2nd is the only day for which Hill was absent and for which his absence was attributed to bereavement leave.

Jim Walter argues that "Hill was not entitled to the pay under the CBA," for the two non-optional days of bereavement leave because Hill was not absent for attending a funeral; rather, Hill was absent for medical reasons.[24] And because Hill was absent for medical reasons, he was eligible to receive sickness and accident benefits under the CBA; Hill applied for and received these benefits. Jim Walter argues that it did not pay Hill sickness and accident benefits plus

---

[23]Hill was scheduled off on May 21st and May 28th, and he was not scheduled to work on May 29th because it was a holiday.

[24]The pertinent CBA provisions are quoted *infra* at n.13.

31

bereavement leave because Jim Walter "does not read the CBA to mandate that [Jim Walter] simultaneously provide employees bereavement pay and sickness and accident benefits." (Def.'s Br. Supp. Summ. J. at 19.)  The court is persuaded by this argument.  Were the court to find that Hill was entitled to bereavement pay under these circumstances, then the court would be requiring an employer to pay its employee two times for one day of work when that employee did not even work on that day; in other words, Hill would be making more money by being absent than he would by working.  The court thus finds that Hill has articulated a legitimate, non-discriminatory reason for not paying Hill bereavement leave.

Not only can the court not detect any argument by Hill in his brief that Jim Walter's articulated reason is pretext for unlawful race discrimination, but the court also cannot detect any evidence that would allow the court to make an argument for Hill.  In his deposition, Hill hints that he believed that Jim Walter's interpretation of bereavement leave rule was erroneous.  In order to survive summary judgment on his claim that Jim Walter discriminated against him when he was not paid for bereavement leave, Hill must produce more than his belief that Jim Walter interpreted the rule incorrectly in an effort to carry out some sort of racial animus.  Furthermore, Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.  *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984).  Because Hill has not produced any evidence of pretext, Jim Walter is entitled to summary judgment on Hill's claim that Jim Walter discriminated against him when he did not receive pay for bereavement leave.

Not only is Jim Walter entitled to summary judgment on Hill's hostile work environment claims, but it is also entitled to summary judgment on Hill's claims that Jim Walter discriminated

and retaliated against him.

Though the court has reached the conclusion that Jim Walter is entitled to summary judgment on all claims asserted by Hill, there is one final loose end. The parties mention and the record further explains that the termination of Hill's employment was the subject of a grievance and subsequent arbitration proceeding. This arbitration proceeding was initiated after the instant litigation was commenced. Aside from what has already been said about the arbitrator's decision in the preceding pages, the court cannot ascertain the significance that the parties attribute to this arbitration decision. Accordingly, the court will give it none.

## III. CONCLUSION

For the foregoing reasons, the motion for summary judgment must be granted in favor of Jim Walter on all claims. A separate and appropriate order will be entered.

DONE this _____8_____ day of July 2002.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE