UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CARL HILL,

    Plaintiff,

vs.                              CV-00-N-3400-S

JIM WALTER RESOURCES, INC.,

    Defendant.

**Memorandum of Opinion**

## I.   Introduction.

The plaintiff instituted this action on November 27, 2000, under the provisions of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, asserting claims against his employer, Jim Walter Resources, Inc. ("JWR"), for race discrimination, hostile work environment, and retaliation. On March 22, 2002, JWR filed a motion for summary judgment [Doc. #12] that was granted by the then presiding judge on July 8, 2002 [Doc. # 20, 21].[1]

The court has familiarized itself with the record, including the defendant's motion for summary judgment and the parties' submissions in support of and in opposition to that motion, and is aware of no adequate reason why it should not proceed with consideration of the motion for summary judgment. Upon such consideration, the court has determined that the defendant's motion should be granted in all respects and the action should be dismissed.

---

[1] The case was originally assigned to United States District Judge William M. Acker, but was reassigned on July 11, 2002.

## II. Facts.

For the purpose of this memorandum and accompanying order, the court adopts the statement of material facts set forth in Judge Acker's memorandum opinion of July 8, 2002, with the exception that it can find no evidence to support the statement that JWR issued a verbal warning to Ronnie Mays, Hill's supervisor.

## III. Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 243. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

**IV.    Discussion.**

Hill asserts three separate causes of action against JWR:[2] (1) he was subjected to a hostile work environment; (2) JWR discriminated against him by issuing attendance

---

[2] The court analyzes the separate bases of this action, Title VII and 42 U.S.C. § 1981, simultaneously as they are both subject to the same standards of proof and are analyzed in an identical fashion. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both of these statutes have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.")

warnings to him and by forcing him to take a drug test because of his race; and (3) the defendant retaliated against him because he complained to management about several incidents of racial harassment.[3] JWR responds that even if the plaintiff was subjected to a hostile work environment, it cannot be held liable for that environment and that it acted for legitimate, non-discriminatory reasons with respect to the other claims.

**A.     Hostile Work Environment.**

To survive summary judgment on a claim of hostile work environment, a plaintiff must set forth evidence demonstrating the existence of a prima facie case. In particular, he must prove that: (1) he is a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based upon his race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of his employment and create a discriminatorily abusive environment; and, (5) there is a basis for holding the employer liable. *See Shields v. Fort James Corp.*, 2001 WL 392667, *5 (S.D. Ala.) (*citing Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582-83 (11th Cir. 2000)). JWR argues that, regardless of whether he can prove the first four elements of the prima facie case, Hill can demonstrate no basis upon which to hold JWR liable.

An employer can be held liable for a hostile work environment either directly or vicariously. To establish a case of direct liability, the discrimination must come from a co-worker and the plaintiff must show that the employer "knew or should have known of the harassing conduct but failed to take prompt remedial action." *Miller v. Kenworth of*

---

[3] In his response to JWR's motion, Hill abandoned his discrimination and retaliation claims relating to JWR's refusal to grant him additional bereavement leave or pay him for that which he took.

*Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002) (citing *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000)). A plaintiff can demonstrate the requisite knowledge on the part of the employer by showing that the employer had actual knowledge of the conduct or that the conduct was sufficiently severe and pervasive that the employer can be charged with constructive knowledge. *Id.* With regard to vicarious liability, the Supreme Court has stated that an employer cannot be liable for a hostile environment created by its supervisors if the employer can demonstrate that it "exercised reasonable care to prevent and correct promptly any [racially] harassing behavior" and that the employee bringing suit "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).[4]

Hill points to several incidents as support for his hostile work environment claim, which can be divided into conduct that occurred prior to May 17, 1999, the date on which JWR convened a meeting with Hill and others to discuss his allegations of a racially hostile work environment, and conduct that occurred thereafter. Conduct occurring pre-May 17 includes: (1) a co-worker's two comments that he had a confederate flag rug that Hill could place on his hardwood floors in response to Hill's comment about redoing the hardwood floors of his house; (2) a comment by a co-worker that if the mine closed, he would open a restaurant that served fried chicken and that Hill would be his first customer, and that

---

[4]There is, of course, no affirmative defense available to an employer if its supervisor takes a tangible employment action against the plaintiff employee. *See Faragher*, 524 U.S. at 807. However, Hill does not argue that his hostile work environment claim rests on a tangible employment action and the court cannot discern any such claim on the basis of the present record.

Blacks eat watermelon; (3) an occasion on which a supervisor instructed Hill and another black employee to complete a task when, the day before, he had not required the same of Hill when Hill was working with a white employee; (4) an occasion on which the same supervisor asked Hill to move a transport device after a white employee refused to move it; and (5) an occasion on which that supervisor instructed Hill to unload supplies when he was on a work break instead of three other white employees who were also on break. Post-May 17 conduct of which Hill complains includes: (1) a confederate flag being hoisted on a flag pole approximately five miles from the mine in which Hill works; (2) a confederate flag being drawn above a time clock and nearby trash can; and (3) a noose being hung in a section of the mine.[5]

1. **Co-worker Harassment.**

As to co-worker liability, which includes the first and second items of pre-May 17 conduct and all three items of the post-May 17 conduct, the court adopts Judge Acker's memorandum opinion of July 8, 2002, which is set forth below.

> In Hill's hostile work environment claim, he claims that Whitsett and Thomas made racial comments to him regarding stereotypical types of food eaten by African-Americans and regarding confederate flags. He also claims that the flying of a confederate flag on a pole near the mine site, the drawing of a confederate flag, and the presence of a noose underground constitute racial harassment by his co-workers. To demonstrate a basis to hold [JWR] directly liable for the harassment of Hill by co-workers, Hill must demonstrate that a genuine issue of material fact exists on the questions of whether [JWR] had actual or constructive notice of the harassment and whether [JWR] failed to take remedial action. The court finds that Hill cannot meet this burden.

---

[5] Hill has abandoned his claim as it relates to a heated argument that he had with Nathan Morgan, a supervisor.

"Actual notice is established by proof that management knew of the harassment, whereas constructive notice will be found where the harassment was so severe and pervasive that management should have known of it." *Miller*, 277 F.3d at 1278. Because Hill filed a grievance with his union president and because the president informed Shalvey, the Assistant Mine Manager, of the grievance, [JWR] had notice of the comments made by Whitsett and Thomas. Additionally, on the very day that [JWR] learned of the harassing behavior [(May 17,1999)], [JWR] held a meeting with Hill. Thereafter, Kelley, the Industrial Relations Supervisor, investigated the matters, met with each of the alleged offenders, and obtained admissions of guilt from Thomas and Whitsett. Kelley reminded Whitsett and Thomas of [JWR]'s policy against harassment, and he issued verbal warnings to them. Kelley also met with the supervisor who allegedly witnessed one of these comments, and Kelley reminded him of his obligations to report such harassing conduct. Thus, because [JWR] acted swiftly in meeting with Hill and investigating the incidents, because [JWR] imposed what it perceived to be an appropriate form of discipline, and because [JWR] adhered to its anti-harassment policy, the court cannot find that [JWR] failed to take proper remedial action.

Given that Kelley and the mine manager of Mine #4 saw the confederate flag that was flying from a flag pole near Mine #4 and given that Kelley testified to having been informed of the confederate flags drawn near the time clock and on a trash can, the court is hard-pressed to find anything but that [JWR] had actual knowledge of these incidents. Nonetheless, the precedent by which this court is bound would dictate a finding that [JWR] did not have actual notice of these occurrences because Hill did not file a grievance or otherwise report these incidents to the Industrial Relations Supervisor or Mine Manager, as is required under the anti-harassment policy. This line of inquiry is not necessarily important, however, because the court also concludes that, if [JWR] had any kind of notice of the flags, then [JWR] took prompt remedial action. After Kelley saw the flag on the flag pole, he removed it, took it home, and destroyed it. Once Kelley was notified of the flag drawings, he instructed an employee to paint over them. Thus, by the end of Hill's shift on the day that he noticed the flag and the flag drawings, there were no confederate flags and no confederate flag drawings located in and around Mine #4. Consequently, with respect to the confederate flag incidents, Hill cannot demonstrate the existence of a genuine issue of material fact which would warrant a trial on the merits, addressing the question of whether [JWR] has satisfied both prongs of the affirmative defense.

When considering the noose incident, the court's inquiry must proceed beyond the question of actual notice. Neither Hill, nor any other employee, ever reported to [JWR] the incident in which Hill allegedly found a noose while working underground. If it is true, as Hill contends, that Harris witnessed this incident, Harris did not inform the Industrial Relations Supervisor or the Mine Manager. Thus, the court cannot find that [JWR] had actual notice of this incident. The court is equally hard-pressed to find that [JWR] had constructive notice of the noose. When considering the issue of constructive notice of harassment, the Eleventh Circuit holds the following factors to be relevant:

> "(1) the remoteness of the location of the harassment as compared to the location of management; (2) whether the harassment occurs intermittently over a long period of time; (3) whether the victims were employed on a part-time or full-time basis; and (4) whether there were only a few, discrete instances of harassment."

*Miller*, 27 F.3d at 1278-79 (quoting *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997)). Additionally, courts consider whether the employer maintained an anti-harassment policy: "when an employer has 'promulgated an effective and comprehensive' anti-harassment policy that is 'aggressively and thoroughly disseminated' to its employees, an employee's failure to utilize the policy's grievance process will prevent constructive knowledge of such harassment from adhering to the employer." *Miller*, 277 F.3d at 1279 (quoting *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997) (alteration in original)). Thus, because [JWR] has an anti-harassment policy that was published to the employees and posted at the mine site, because the policy clearly states that complaints of harassment are to be directed to the Industrial Relations Supervisor or the Mine Manager, and because Hill did not follow those procedures outlined in the policy, the court finds that [JWR] cannot be imputed with constructive notice of the noose incident. Furthermore, the noose incident was isolated, and it occurred only on one occasion. Even examining the noose in combination with the other alleged instances of harassment, the court finds that the harassing conduct was not sufficiently severe or pervasive as to constitute constructive knowledge to [JWR] because the allegedly harassing incidents appear to be infrequent, disconnected, and occurring over a relatively short period of time.

Because the court cannot find that [JWR had] actual or constructive notice of the allegedly harassing incidents, the court finds that . . . there is no basis for holding [it] liable for [those] incidents . . . . Accordingly, [JWR] is

> entitled to summary judgment on Hill's hostile work environment claim insofar as he asserts that co-workers created that environment.

Memorandum Opinion of July 8, 2002, at 17-20. This court adds only the following to the foregoing as to the incident involving the noose. Hill alleges that Harris a supervisor, was with him when he saw the noose and that he did not inform management of the noose because he thought that Harris, as a supervisor, would do so. The Eleventh Circuit's opinion in *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317 (11th Cir. 1999), controls this issue. In *Dudley*, the Court found that the employer did not have actual knowledge of racially harassing conduct because, even though a store manager and co-manager of the defendant corporation had knowledge of the conduct, they were not high enough in the defendant's corporate structure to impute knowledge to the corporation itself. *Dudley*, 166 F.3d at 1323. This court finds that, like the managers in *Dudley*, Harris was not sufficiently high in JWR's corporate structure to impute knowledge to JWR.[6]

### 2.   Supervisor Harassment.

The remaining incidents pertaining to a hostile work environment relate to conduct on the part of Ronnie Mays, a supervisor. His conduct was described by the parties as follows:

> On one occasion, while Hill rock dusted the coal mine with Judy George, a white female, Supervisor Ronnie Mays instructed Hill and George to stop at the telephone line because Mays was on the telephone. The next day, Mays told Hill and Cora Day (an African-American female) to also stop at the

---

[6] The court also pauses to point out that, while Hill states that he was unaware of the details of JWR's anti-harassment policy, including to whom he was supposed to report allegations of harassment, the individuals to whom he was supposed to have reported allegations of harassment under the anti-harassment policy appears to have been spelled out in the settlement agreement into which he and JWR entered a few years ago in similar litigation. Any contention that he was unaware of how to proceed when confronted by allegedly discriminatory conduct simply will not lie.

> telephone line. However, Mays subsequently instructed Hill and Day to finish rock dusting. About ten minutes later, Mays sent Doug Stephenson (a white male) to help Day and Hill. Hill believes this incident is racial harassment because Mays instructed Hill and Day to finish the task, but failed to do so on the previous day when Hill rock dusted with George, a white female. . . .
>
> On another occasion, Ronnie Mays asked Hill to move a man bus, a transport device, when Judy George refused to move it. . . .
>
> Finally, as Hill's allegations relate to Ronnie Mays, on one occasion, while Hill and white employees . . . Judy George (a miner helper), Doug Stephens (roof bolter) and Bobby Jones (electrician) were on a work break, Mays instructed Hill to unload supplies. Although Hill was the only Inside Laborer present, Hill attributed this incident to race.

Def.'s Br. at 4. Hill had a meeting with JWR management concerning this and other allegedly discriminatory conduct on May 17, 1999. Directly after this meeting, JWR conducted an investigation, with Rayford Kelley, the Industrial Relations Supervisor at Mine #4, interviewing Mays about the above-noted allegations of harassment. Although Kelley's notes do not reflect that he verbally warned Mays about the conduct in question, JWR asserts that Hill never had another problem with Mays after that interview. While Hill does not dispute this, he responds that the only reason he did not have another problem with Mays is because Hill was transferred shortly thereafter.

The court finds that regardless of the transfer, the fact remains that after JWR became aware of and investigated Hill's allegations, Mays never again did anything to Hill of which Hill complained. Moreover, and more fundamental to the entire inquiry, the court finds that, based on Eleventh Circuit precedent, the harassment of which Hill complains as it relates to Mays, if it can even be termed harassment, was not severe, was not pervasive, and contributes absolutely nothing to the "totality of circumstances" at which Hill would like this

court to look. *See Mendoza v. Borden*, 195 F.3d 1238, 1243-44 (11th Cir. 1999) (following conduct not considered actionable hostile work environment: the plaintiff's supervisor constantly watched her, followed her around, and looked her up and down; on two occasions when he was looking her up and down, the supervisor stared at the plaintiff's groin and made sniffing motions; he rubbed his right hip against the plaintiff's left hip while touching her shoulder and smiling; finally, the supervisor told the plaintiff on one occasion that he was "getting fired up."); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 578-79 (11th Cir. 2000) (following conduct not considered actionable hostile work environment: the alleged harasser looked the plaintiff up and down; he suggested that they have lunch at a Hooters restaurant; he frequently called her at home in the evenings, asking her if she was in bed or where her boyfriend was; he asked her to lunch on several occasions; he told her that some of the other faculty with whom she ate lunch were racist and evil; he put his hand on her right thigh, partially on the inside of her leg; he lifted the hem of her dress about four inches; he touched a bracelet she was wearing and told her that it was very nice; he touched a ring she was wearing; in her presence, he unbuckled his belt and unzipped his pants in order to tuck in his shirt; he told her that she was beautiful; in reference to the promiscuity of western culture, he told her that she was "innocent and . . . [did not] have much experience"; on the morning following a bad thunderstorm he asked her why she did not call him and invite him to spend the night; finally, he explained to the plaintiff that men are superior to women, that women are like meat, and that "men need variety in women."). Accordingly, JWR is entitled to summary judgment on Hill's hostile work environment claim as it concerns Mays' conduct.

### B. Discrimination and Retaliation.

Hill argues that JWR engaged in disparate treatment and retaliation against him when it issued written warnings to him concerning chronic and excessive absenteeism and required him to undergo a drug test. As with a claim for hostile work environment, in order to survive summary judgment on disparate treatment and retaliation claims, a plaintiff must demonstrate a prima facie case by setting forth evidence of the specific elements of the claims. *See Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 511 (11th Cir. 2000); *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701-02 (11th Cir. 1998). Upon such a showing, the burden shifts to the employer to set forth one or more nondiscriminatory explanations for the adverse employment action that it took in regard to the plaintiff. *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). This is a burden of production and not one of persuasion. *Id.* Should the employer be able to set forth such a reason, the inference of discrimination that was created by the prima facie case drops out and the burden returns to the plaintiff to show that the employer's proffered explanation is merely a pretext for age discrimination. *Id.* In responding to a defendant's legitimate, non-discriminatory reason justifying its complained-of action,

> [a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, **an employee must meet that reason head on and rebut it**, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Id.* at 1030 (emphasis added).

Both parties focus their arguments on the legitimate, non-discriminatory reason proffered by JWR to support both of the actions of which Hill complains. Because, as noted above, the burden shifting framework applies to both retaliation and disparate treatment claims, and because the justification set forth by JWR is equally applicable to both claims, the court addresses them simultaneously, separately discussing each complained-of action.

1. **The Written Warnings for Chronic and Excessive Absenteeism.**

The court initially notes its agreement with Judge Acker's memorandum opinion regarding this issue and adopts it verbatim:

> Kelley issued a written warning to Hill on January 7, 2000, for excessive absenteeism. This warning provided that Hill "must work regular or further discipline will follow." Hill was issued a final written reprimand on May 31, 2001, because, according to Kelley, Hill had a pattern of missing work around the weekends and holidays. This warning also indicated . . . that further discipline would be imposed if Hill did not "work regular."
>
> From reviewing Hill's attendance records for the years 1999, 2000, and 2001, Hill took advantage of and was absent on 46-48 days of each year for various kinds of contractual leave. And in those same years, Hill missed numerous days that were not granted to him under the CBA. In fact, Hill missed an additional 30, 61, and 27 days in 1999, 2000, and 2001 respectively. . . . Assuming that Hill was scheduled to work 6 days a week, for 52 weeks of the year, and considering the number of contractual leave days taken by Hill and the number of days Hill was otherwise absent, out of a possible 312 days of work, Hill was present for 236 days in 1999, 205 days in 2000, and 237 days in 2001. Thus, at best during these three years, Hill was present for work only on 76% of the days for which he was scheduled.
>
> Furthermore, after reviewing the calendars and attendance records for the three years in issue, it appears that there was indeed a pattern to Hill's absenteeism. He used his contractually-granted graduated and floating vacation days and his contractually-granted sick/personal days in the first quarters of the years. It also appears to the court, that more frequently than not, Hill was absent from work for multiple days at a time, rather than for one day at a time; and on several occasions, Hill's absences appeared to be designed to extend holidays, weekends, and vacations.

13

> Consequently, the court finds that [JWR] has sufficiently articulated a legitimate, non-discriminatory and non-retaliatory reason for issuing the two reprimands to Hill. Furthermore, the arguments made by Hill do not persuade the court that these articulated reasons are mere pretext for unlawful discrimination and retaliation. Hill focuses his arguments on the fact that [JWR] is responsible for a great number of Hill's absences. The aforementioned numbers relied upon by the court discount the days where Hill was absent because [JWR] management, for whatever reason, told him to be absent. Hill also argues that Hill is "allowed to use his ... guaranteed contract days whenever he ... so desires." (Pl.'s Opp'n Mot. Summ. J. at 18.) While this argument may be factually true, this argument alone does not create pretext. Hill asserts that in 1999, 91% of his absences were either "guaranteed to him pursuant to the union contract, caused by the defendant cancelling the plaintiff's shift and/or were caused by the plaintiff being out of work and under the care of his physician. In 1999, the plaintiff had seven absences that were designated by the defendant as 'unexcused.'" (Id.) In making this argument, Hill assumes that an absence for sickness should automatically be excused, with or without a doctor's excuse  Hill also appears to assume that employees are always entitled to miss work for sickness with impunity. The court does not operate on these assumptions, and these assumptions do not add up to pretext.... Additionally, Hill attempts to call into question the legitimacy of Kelley's statement that he has issued warnings to three white employees for attendance problems, but Hill does so without remembering that he bears the burden of persuading the court, at this stage, that there is at least a genuine issue of whether [JWR] was motivated by discriminatory and retaliatory animus. Hill has not persuaded the court that such an issue exists. Accordingly, [JWR] is entitled to summary judgment on the claims that [JWR] discriminated and retaliated against him when [JWR] issued the two warnings for chronic and/or excessive absenteeism.

Memorandum Opinion of July 8, 2002, at 25-27 (footnotes omitted).

This court only adds the following observation to Judge Acker's opinion. As Judge Acker noted, the primary thrust of Hill's response to JWR's reason for issuing him written warnings concerning attendance is that he had relatively few unexcused absences compared to his overall absences and that he therefore was not in violation of Article XXII(i) of the Collective Bargaining Agreement. What Hill fails to mention is that JWR issued warnings to him for violations of both Article XXII(i) and JWR Work Rule 19 and that,

according to the arbitrator who heard his grievance concerning his discharge,[7] "employees may be disciplined and discharged for excessive absenteeism, and that employers may count absences due to illness which are covered by doctor's excuses and absences for other valid reasons as part of an employee's overall record of excessive absenteeism." Pla.'s Ex. 10 at 13. As noted above, in addition to his contractually guaranteed days, Hill missed 30, 61, and 27 days in 1999, 2000, and 2001, respectively. These numbers do not include those shifts that JWR itself cancelled or cut short. That he did not accrue a sufficient number of unexcused absences to be titled an "irregular worker" does not defeat JWR's legitimate, nondiscriminatory reason for disciplining him.

### 2. The Drug Test.

As Judge Acker noted, JWR's substance abuse policy provides that it has reasonable cause to require a drug test of an employee if that employee has been placed in an attendance control program. "Because [JWR] had issued attendance warnings to Hill for violations of the Work Rules and Article XXII, and because Hill had been placed under the attendance control program, [JWR] had reasonable cause to require Hill to submit to a drug test." Memorandum Opinion of July 8, 2002, at 28. Hill's argument that the arbitrator held that his absenteeism was not excessive or a violation of JWR's attendance control policies is unavailing because, simply put, that was not the opinion of the arbitrator. The arbitrator found that Hill's "overall record of absenteeism **from May 31, 2001, through February 20, 2002** was not excessive, and showed significant improvement in terms of his overall absenteeism and his pattern of absenteeism **after he got his final written warning**." Pla.'s

---

[7] Hill's discharge and subsequent reinstatement, because of their dates, are not part of his lawsuit.

Ex. 10 at 14 (emphasis added). The arbitrator's finding of an improvement after JWR issued Hill the final written warning does nothing to demonstrate pretext, as it is undisputed that Hill was required to submit to a drug test after he had first been warned about his attendance problems but **before** JWR issued him the final warning. As a result, JWR's legitimate, non-discriminatory reason for testing him remains unrebutted and, as Judge Acker found, summary judgment should be granted on this issue in JWR's favor.

### V. Conclusion.

The court does not doubt for one moment that there remain numerous genuine instances of unlawful discrimination in the work place. Certainly, these instances are sufficient in number to provide full employment opportunities for all the lawyers who want to engage in that field of work. This case obviously does not present any such genuine instance of discrimination and were the law regarding fee shifting against plaintiffs and their attorneys not so heavily weighted in favor of employees and against employers, this would likely be a case in which the loser should be required to pay.

Based on the foregoing, the court finds that JWR's motion for summary judgment is due to be granted and this case dismissed. A separate order will be entered contemporaneously with this memorandum of opinion.

Done, this 31st of July, 2002.

_____
Edwin Nelson
United States District Judge